CLARENCE R. DANIEL and NANCY H. DANIEL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Daniel v. Commissioner
Docket No. 1580-75.
United States Tax Court
T.C. Memo 1978-277; 1978 Tax Ct. Memo LEXIS 244; 37 T.C.M. (CCH) 1180; T.C.M. (RIA) 78277; July 24, 1978, Filed *244 Petitioner leased certain improved real property for the purpose of running a restaurant. The lease was for a period of five years with an option to renew for another five-year period, plus an option to purchase the subject property at any time the lease was in effect. Petitioner derived a profit under the lease during the initial five-year term. However, immediately prior to petitioner's exercise of his option to renew the lease for an additional five years, the restaurant operation closed. He never succeeded in getting the restaurant reopened and derived no income from the property during the second five years of the lease. During the fourth year of the renewal period, petitioner exercised his option to purchase the property. Held, the lease and its renewal were entered with a profit motive and, as such, rental payments made under the lease agreement may be deducted under either section 162 or 212 as either trade or business expenses or expenses incurred in the production of income; such payments were not payments made for the acquisition of a capital asset. Held,further, other miscellaneous expenditures determined to be capital in nature because petitioner failed *245 his burden to show otherwise. Thomas J. Stevens and F. Timothy Nicholls, for the petitioners. Mathew E. Bates, for the respondent. IRWIN
MEMORANDUM FINDINGS OF FACT AND OPINION IRWIN, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1971 and 1972 in the amounts of $ 493.32 and $ 1,560.38, respectively. After concessions of the parties, the only issue which remains for our decision is whether certain payments made by petitioners represent the payment of ordinary and necessary expenses of carrying on a trade or business, or expenses incurred for the production of income. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts along with attached exhibits are incorporated herein by this reference. Petitioners, husband and wife, were legal residents of Durham, N.C., at the time of filing their petition herein. They filed their joint Federal income tax returns for *247 the taxable years 1971 and 1972 with the Internal Revenue Service Center, Memphis, Tenn. Since Nancy H. Daniel is a party hereto solely by reason of having filed a joint income tax return with her husband for the years in issue, Clarence R. Daniel alone will hereafter be referred to as the petitioner. At the time of trial, petitioner had been engaged in the restaurant business for 21 years. Although he had also owned some rental property and operated a car wash and service station, his principal business was restaurant operations. He had been involved in over 20 restaurant operations, as either an owner or manager, but in only one previous instance had he actually owned the restaurant property, preferring instead to lease. In the one previous instance of ownership, he had an option to purchase which he exercised. During portions of this period (including 1969), petitioner operated more than one restaurant. During 1963 petitioner leased certain real property from Sarah Llewellyn (hereafter Llewellyn) for the purpose of operating a drive-in restaurant. The lease agreement covered property located at the intersection of Hillandale and Hillsborough Roads in Durham, N.C., consisting *248 of land and a building, and was for a two-year period at a monthly rental of $ 125. Prior to June 15, 1964, petitioner spent $ 5,000 on this property to bring it up to the standards required by the Durham County Health Department. Petitioner operated the restaurant himself until sometime in 1964. On June 15, 1964, petitioner entered into a new lease with Llewellyn. Petitioner renegotiated the lease to protect the $ 7,000 investment he had made in the leased property [1] and to protect the profit which he was realizing from its operation. The new lease provided for a five-year term with an option in favor of petitioner to renew for an additional five years. The monthly rental was to be $ 150 during the initial five-year period and $ 175 during the second five-year period. These rental rates were not in excess of the fair rental value of the property. The lease required petitioner to be responsible for all utilities and expenses for the upkeep of the property and for Llewellyn to be responsible for all ad valorem taxes and insurance on the property. The lease further provided that Llewellyn could terminate the lease with cause, and that petitioner, at any time during the term *249 of the lease, would have the option to purchase the property, together with all improvements thereon, for the sum of $ 30,000. The lease also contained the following provision: It is understood and agreed that should the building situated upon said premises be damaged by fire, storm or any act of God, or for any other cause that would render said building unfit for use as a restaurant, the rent shall abate until said building shall be put in proper condition by the Lessors for continued use as a restaurant. On June 15, 1964, petitioner subleased the property to Edna Grant for $ 150 per week. She operated a drive-in restaurant on the premises, for which petitioner supplied the equipment, until the latter part of 1968 when she suffered an accident which rendered her unable to continue its operation. Mrs. Grant's daughter assumed operation of the restaurant for a short period subsequent to the accident, but it closed permanently *250 in early 1969. In November 1967 Watkins & Brewer, Inc., of Durham sought to list the property for $ 55,000 and in July 1968 Interstate Realty, Inc., of Greensboro, N.C., solicited a listing from petitioner in the amount of $ 60,000. Apparently, throughout the entire ten-year lease term, there were other attempts to get petitioner to list the property by various other realty companies, but petitioner consistently refused to sign such listing contracts. On March 3, 1969, petitioner exercised his option to renew the lease for an additional five-year period. At the time he exercised this option, he knew the restaurant had ceased operation and was generally aware of what was necessary in order for the restaurant to reopen in terms of the requirements imposed by the Durham County Health Department. In the fall of 1969, petitioner was specifically notified that he would have to undertake substantial renovations in order to bring the existing structure up to the standards required by the Durham County Health Department for operation of a restaurant. From early 1969 until January 1973, when petitioner exercised his option to purchase, as described hereinafter, the property was nonproductive. *251 In early 1970 petitioner was still trying to reopen the restaurant without making substantial improvements. However, after again talking with the Health Department in mid-1970, petitioner finally realized that only a substantial remodeling job would get the restaurant open again. The Health Department had even told petitioner that it would not issue a permit to reopen the restaurant unless he demolished the existing structure and erected a new one, because it was not possible for the structure then existing on the premises to meet the health standards for a restaurant. In November 1970 petitioner submitted a new lease agreement to the Llewellyns. The salient characteristics of the lease were a 15-year term, a monthly rental of $ 100, an expressed intent that petitioner would demolish the existing structure and erect a new one, and an option in favor of petitioner to purchase the property for $ 15,000. The apparent purpose behind this proposed extended lease agreement was to allow petitioner time to recoup the investment he would make in erecting a new building, plus a margin for profit. However, petitioner never received a response from the Llewellyns on the proposed lease.
*252 During the latter half of 1970 petitioner ceased making rental payments. Apparently, contact between petitioner and the lessor was poor and petitioner wanted to settle some doubts which he had as to his continued obligation to make rental payments given the dilapidated condition of the structure. However, rather than risk losing the lease, he made up all back rental payments on December 15, 1970. In 1971 petitioner explored the possibility of erecting a car wash on the leased property. He obtained an estimate of $ 17,000 for such a project; however, petitioner considered the estimated cost excessive, and he rejected this as a possible alternative. Apparently, the cost of paving the lot was the key factor in the high cost. Petitioner never gave up the idea of a restaurant on the site. Finally, in 1972, he decided to proceed to remodel the existing structure. He was willing to invest $ 16,000 for such a job, $ 10,000 for the remodeling itself and $ 6,000 for equipment. Petitioner hired Willard Kidd (hereafter Kidd) to handle the job of remodeling and operating the business. However, once petitioner and Kidd began the remodeling process, it became obvious that the cost of *253 such a project was going to exceed $ 10,000. An estimate was obtained from another party, who determined that $ 23,000 was necessary to remodel the existing structure. Only then did petitioner finally abandon the restaurant idea. The final alternative explored by petitioner was the building of a convenience store on the site. Petitioner obtained an estimate for the construction of such a unit from B&B Woodcraft, a local company. However, because this company required one-third of the estimated construction cost in advance, petitioner rejected the proposal. In pursuance of the convenience store idea, petitioner also contacted people he believed might be interested in installing gas pumps on the premises, and in connection with such installation, to pave the lot. Kidd contacted Pace Oil Company with such a proposition, but the parties could not work out a mutually acceptable lease agreement. Petitioner contacted Carey Oil Company (hereafter Carey) to see if such an agreement could be arranged. While Carey was not receptive to that particular arrangement, it was interested in purchasing the site outright. Accordingly, in January 1973 petitioner exercised his option to buy the *254 subject property for $ 30,000, which he thereafter sold to Carey in September 1973 for $ 48,000. Petitioner had made one offer to purchase the property previous to his exercise of the option. The lessor, Llewellyn, had died and her estate, unaware of petitioner's lease and option to buy the property, attempted to sell it through the Allen Realty Company (hereafter Allen Realty) in 1972 for $ 25,000. When petitioner learned about this he attempted to purchase it for that amount, informing Allen Realty of his lease and option to buy. However, when Allen Realty realized the option price in the lease was $ 30,000, it refused and no longer offered the property for sale. In the notice of deficiency, respondent disallowed petitioner's deductions for rents paid with respect to the subject property in the amounts of $ 2,280 for 1971 and $ 3,465 for 1972. Respondent also disallowed deductions for payments made by petitioner in 1971 for legal expenses of $ 260.33, and payments made in 1972 for cleanup expenses of $ 840 and plan, survey and appraisal expenses of $ 350. The legal expenses were incurred in connection with a title search of the property. The $ 840 expense was a payment *255 to Kidd for the aborted remodeling effort in 1972. The plan, survey and appraisal expenses related to any building to be constructed on the site, whether it was to be a restaurant or a convenience store. ULTIMATE FINDING OF FACT The lease payments made by petitioner in 1971 and 1972 under the Llewellyn lease represented rent payments for the use of property and not capital expenditures in connection with the subsequent purchase of the property. OPINION Petitioner's claimed deductions are based upon sections 162 and 212.[2] Respondent's rationale for disallowance of these deductions can be summarized as follows: (1) that petitioner was not in a trade or business with respect to the subject property and, therefore, none of the disallowed expenditures are deductible under section 162; (2) that the payments by petitioner with respect to the property were not incurred for the production of income or for the management, conservation, or maintenance of property held for the production of income and, therefore, are not deductible under section 212; and (3) that none of the payments are deductible under either section 162 or section 212 because they were not "ordinary and necessary" *256 under the requirements of both of those sections. The first issue which must be resolved is whether petitioner used the subject property either in a trade or business or for the production of income during 1971 and/or 1972. If we decide that the activities here in question qualify as being either in a trade or business or for the production of income, we must proceed to determine whether the expenditures were ordinary and necessary. We believe petitioner's rental payments qualify for deductibility under either section 162 as a trade or business expense or under section 212 as an expense incurred in the production of income. [3]
*257 Actually, we are somewhat confused as to the specific reasons for respondent's determination that petitioner was not engaged in a trade or business or an activity for the production of income. He seems to question petitioner's profit seeking motive, pointing out that the subject property was nonproductive during the years in issue. However, under the applicable standards it seems clear that petitioner's activity was profit seeking. Whether an activity is engaged in for profit depends upon all the facts and circumstances of the particular case. Coffey v. Commissioner,141 F. 2d 204 (5th Cir. 1944); Jasionowski v. Commissioner,66 T.C. 312, 321 (1976); Sabelis v. Commissioner,37 T.C. 1058 (1962); section 1.183-2(a), Income Tax Regs. There need not even be a reasonable expectation that the activity will result in a profit; rather it is sufficient that the activity is entered into with the good faith purpose of making a profit. Doggett v. Burnet,65 F. 2d 191 (D.C. Cir. 1933); Jasionowski v. Commissioner,supra at 321; Benz v. Commissioner,63 T.C. 375, 383 (1974); section *258 1.183-2(a), Income Tax Regs. If petitioner entered into the lease with the good faith purpose of making a profit, we believe he has met the requisite profit standard. We do not believe it appropriate to isolate two years out of the lease period, during which required rent payments were made (although no income was realized) and to test them in a vacuum for the presence of a profit motive. Rather, it is the motive behind the transaction (here the lease transaction), which we believe to be determinative. Section 1.183-2, Income Tax Regs., sets forth various factors which may be looked to as evidence of a taxpayer's good faith purpose to make a profit. We believe that several of these factors indicate petitioner herein had such a good faith purpose. First and foremost, his operation of the property between 1964 and the date he exercised the purchase option in 1973 resulted in a not insubstantial profit. Just as nonprofitability would weigh against the existence of a profit motive, Wiles v. United States,312 F. 2d 574 (10th Cir. 1962), the actual profit earned here obviously weighs in favor of the existence of a profit motive on the part of the petitioner. Petitioner *259 had a number of restaurant operations over a long period of years, including other restaurants which he operated during the lease renewal period when the restaurant in question was not operating. The activity here in question was a natural one for him to undertake. He carried on all these restaurant operations as a "business" for it was his principal livelihood. He had expertise in this area and devoted the major portion of his time to his restaurant operations, including the specific activity in question. Apparently, petitioner was successful in his restaurant operations, and it seems clear that petitioner did not use these activities, including the specific activity here in question, for personal pleasure or recreation as a hobby. Application of hindsight may reveal that petitioner's decision to renew the lease in hopes of making it profitable was a questionable one; however, that does not mean his decision was one devoid of a profit motive. More substantial objections are raised by respondent on the grounds tha the rental and other payments were capital expenditures and, therefore, not "ordinary" in nature, Welchv.Helvering,290 U.S. 111 (1933); *260 see sections 161, 211 and 263; and on the grounds that the rental payments were nonobligatory and, therefore, not "necessary", Montgomery v. United States,63 Ct. Cl. 588 (1927); Michigan Improvement Association v. Rockwood, an unreported opinion (D.N.D. 1960). There have been a number of cases determining the question whether a given stream of rental payments is truly rental payments or is actually payments made, at least in part, to acquire a capital asset. See section 162(a)(3). The determinative factor is the intent of the parties. Breece Veneer & Panel Co. v. Commissioner,232 F. 2d 319 (7th Cir. 1956); Oesterreich v. Commissioner,226 F. 2d 798 (9th Cir. 1955); Benton v. Commissioner,197 F. 2d 745 (5th Cir. 1952); Watson v. Commissioner,62 F. 2d 35 (9th Cir. 1932); Smith v. Commissioner,51 T.C. 429 (1968). Every objective indication in the instant case militates against the proposition that the rental payments here in question represented payments to acquire a capital asset. First, the mere hope by petitioner that he might at some time in the future favorably exercise *261 the option did not create an equity in the property. Breece Veneer & Panel Co. v. Commissioner,supra. Nor was the option price nominal in relation to the value of the property or the total payments to be made under the lease. Benton v. Commissioner,supra;Oesterreich v. Commissioner,supra.While it is true that in January 1973 petitioner exercised the option in question for $ 30,000 and at the same time had already agreed to resell the property for $ 48,000, the appropriate date to measure whether the option price is nominal in relation to the value of the property is the date on which the lease agreement was entered into, not on the date the option was exercised. Breece Veneer & Panel Co. v. Commissioner,supra;Benton v. Commissioner,supra.Although there may be some question as to whether the option price was nominal as of the date of its exercise, we believe that it was not nominal in relation to the property's value in 1964, the date the lease agreement (including the purchase option price) was originally struck. For the same reason, in this case we deem it insignificant *262 that the total of the rental payments actually made, plus the $ 30,000 option price, may have coincidentally totaled some figure approaching the final $ 48,000 sales figure. See Beus v. Commissioner,28 T.C. 1133 (1957), affd. 261 F. 2d 176 (9th Cir. 1958); Haggard v. Commissioner,24 T.C. 1124 (1955), affd. 241 F. 2d 288 (9th Cir. 1956). The option price was agreed upon in 1964. At that point in time, if it was not a reasonable figure, the record tends to indicate that it was too high, not too low. We will not find the transaction before us to be a sale rather than a lease when we believe the option price was the result of a fortunate business bargain by petitioner, and not an attempt to cast a sale transaction in the form of a lease. Other factors also support our conclusion. None of the rental payments were credited toward the option price or otherwise gave petitioner any equitable interest in the property. Irby v. Commissioner,30 T.C. 1166 (1958), affd. on this issue 274 F. 2d 208 (5th Cir. 1960); Haggard v. Commissioner,supra;Bowen v. Commissioner,12 T.C. 446 (1949). *263 Nor were the rental payments in excess of the current fair rental value of the property. Haggard v. Commissioner,supra;Bowen v. Commissioner,supra.For all the foregoing reasons, we have found that the rental payments were not capital expenditures. Respondent also determined that certain other expenditures deducted by petitioner were nondeductible capital expenditures. Petitioner offered no explanation as to the reason for the title search for which he deducted legal fees of $ 260.33. While in certain instances the expenses of a title search may be a currently deductible item, petitioner has shown nothing upon which we could base such a finding. Therefore, because respondent's determination is presumptively correct, Rule 142(a), Tax Court Rules of Practice and Procedure, we hold that the legal expenses incurred in the title search are nondeductible capital expenditures. The remaining items in controversy are the "cleanup expense" of $ 840, which was apparently spent in an aborted remodeling effort; and the "plan, survey, and appraisal expense" of $ 350, expended to determine the location of any structure which might have been erected *264 on the subject property. Respondent determined that such expenditures were capital in nature. Petitioner deducted them as business expenses on his 1972 return. The burden is on the taxpayer to prove the requisite elements of a deduction and, in addition to showing an expenditure to be necessary, he must also show the expenditure to be ordinary in order to be entitled to a deduction. One of the functions of the term "ordinary" in section 162(a) is to clarify the distinction between those expenses that are currently deductible and those that are in the nature of capital expenditures. Welch v. Helvering,supra.We believe that petitioner has failed to carry this burden. Other than merely stating the reason for each expenditure, he has presented no facts or arguments on which we could find said expenditures were ordinary in nature. As a result, we must again sustain respondent's determination as to the character of these items as capital expenditures. Cf. Connally Realty Co. v. Commissioner,31 B.T.A. 349 (1934), requiring the cost of alterations of a building necessitated by the raising of a contiguous street to be capitalized even though *265 the value of the building was not increased nor its life prolonged. The final issue with which we must deal relates to the "necessary" nature of the rental expenditures here in issue. Respondent maintains that the dilapidated condition of the structure relieved petitioner of any obligation to continue paying rent under the following provision in the lease: It is understood and agreed that should the building situated upon said premises be damaged by fire, storm or any act of God, or for any other cause that would render said building unfit for use as a restaurant, the rent shall abate until said building shall be put in proper condition by the Lessors for continued use as a restaurant. He further argues that petitioner knew his obligation no longer existed because he withheld rental payments during the latter part of 1970. On the other hand, petitioner argues that he withheld the rent because he was uncertain of any continuing obligation on his part, that he did not want to take a chance on losing the lease, and that he was unsure his continuing obligation to pay rent was not covered by a succeeding provision in the lease where the petitioner agreed to "pay all expenses for *266 the upkeep of said property." In other words, petitioner claims that because he was uncertain as to which provision governed any further duty on his part to pay, he withheld rentals for a period of time to attempt to force the lessor to contact him so a determination could be made as to his continuing liability. However, rather than risk losing what he felt at this time had become a very favorable lease, petitioner made up all back payments in December 1970. Initially we note general agreement with the proposition set forth by respondent that gratuitous payments may fail the "necessary" requirement for a deduction. [4] In order to determine whether the rental payments here were truly gratuitous, one needs to interpret the phrase in the abovequoted provision "or for any other cause." If that phrase encompasses the natural depreciation process, the petitioner's payments were indeed made without legal obligation. If it was necessary for us to determine whether this provision relieved petitioner of his obligation to pay rent, we would be inclined *267 to find that it dit not. It seems to us that the provision in question is generally what is known as a forcemajeure clause affixing responsibility as between the parties in the case of catastrophic events. As such, under the doctrine of ejusdemgeneris that clause should refer to an occurence of a kind like those specifically enumerated, i.e., catastrophic and sudden in character. It, therefore, seems that the natural deterioration process would not relieve petitioner of his duty to pay rent. [5] However, it is not necessary that we go so far to determine precisely the legal rights which this provision creates under North Carolina law. We do not agree that petitioner's obligation to pay, as far as being "necessary" within the intendment of either section 162 or section 212, is synonymous with legal obligation. We do not believe it is reasonable to require petitioner to maintain his position of nonpayment and hazard losing the lease (in order for him to determine whether he in fact has a legal obligation to continue making rental payments) before allowing *268 him a deduction for such payments as necessary. First, it has been held that truly gratuitous payments can be necessary within the meaning of the relevant statutory provisions. Welch v. Helvering,supra.If they are denied deduction, it is not generally because they are not found to be necessary, but rather because they are found not to be ordinary. But further, it seems to us that the proper rule is that an expenditure is necessary within the meaning of the relevant statutory provisions when it is in payment of a perceived legal obligation, satisfied in good faith, regardless of whether this perceived legal obligation is later found to actually exist. Cf. Waring Products Corp. v. Commissioner,27 T.C. 921 (1957); Anderson v. Bowers,117 F. Supp. 884 (D.C., W.D.S.C. 1954). As such, we hold the rental payments made by petitioner were necessary within the meaning of either section 162 or section 212. Decision will be entered under Rule 155.
Footnotes
1. This $ 7,000 figure is made up of the $ 5,000 which petitioner paid to bring the premises up to the appropriate health standards and another $ 2,000 of unclear origin. Apparently, it was an amount which he paid the previous lessee to secure the lease.↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise indicated.↩
3. Because on the facts before us, the phrase "ordinary and necessary" has the same meaning under both sections 162 and 212, Trust of Bingham v. Commissioner,325 U.S. 365 (1945); Boagni v. Commissioner,59 T.C. 708, 712↩ (1973), it is unnecessary to specifically determine the section under which the rental and other payments would be deductible in order to decide the second issue, that is, were the payments ordinary and necessary.
4. Such payments are probably more often denied deduction as not ordinary.See e.g., Welch v. Helvering,supra.↩
5. See generally, 49 Am. Jur. 2d 577-578 (1970), sec. 604; 52 C.J.S., Landlord and Tenant, sec. 486 (1968).↩